Mary DUNCAN, as Personal Representative of the Estate of Gary Duncan and on Behalf of Mary Duncan, the Surviving Spouse of Gary Duncan, Respondent,

v.

AMERICAN COMMERCIAL BARGE LINE, LLC, Appellant.

No. ED 82171.

Missouri Court of Appeals,
Eastern District,
Division Three.

July 27, 2004.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 28, 2004.

Raymond L. Massey, John S. Farmer, James W. Erwin, St. Louis, MO, for appellant.

Nelson G. Wolff, St. Louis, MO, for respondent.

LAWRENCE E. MOONEY, Judge.

This is an appeal of an admiralty action regarding Gary Duncan, a 48–year–old seaman who died from coronary artery disease that led to an arrhythmia and sudden cardiac death on May 31, 1999, aboard American Commercial Barge Line LLC's vessel, the "Miss Kae D." Mary Duncan, as personal representative of the estate and widow of the deceased, sued the defendant under the Jones Act, 46 U.S.C. Section 688, alleging that the defendant was negligent in failing to provide a safe place for Mr. Duncan to work. The plaintiff argued that Mr. Duncan was overworked through the years and deprived of the help and sleep he needed while working aboard the defendant's vessels. In consequence of these conditions, he suffered from stress and fatigue that caused or contributed to cause his coronary artery disease that ultimately led to his death. After trial, the jury returned a verdict for the plaintiff in the amount of $950,000. The defendant appeals from the trial court's judgment entered upon that verdict.

*Statement of Facts*

Viewed in the light most favorable to the jury's verdict, giving the plaintiff the benefit of all reasonable inferences, the evidence adduced at trial is as follows.

From 1992 to 1996, Mr. Duncan was assigned to work on a number of the defendant's vessels. Beginning in 1996, he was regularly assigned as chief engineer to the Miss Kae D, a 195–foot long, 9000–horsepower inland river towboat, powered by three large diesel engines. As chief engineer, Mr. Duncan's duties consisted of maintaining the vessel's engines and mechanical systems. Mr. Duncan lived and worked on the vessel for approximately 40 consecutive days per trip, and then would be off work for approximately 20 days. However, the defendant often called Mr. Duncan back to work before his 20 days of rest had been completed and he regularly was required to maintain the engine room without assistance for over 40 days at a time.

The defendant's engineers were required to conduct thorough and frequent inspections, maintenance, and repairs. Maintenance was often required because the engines were operated 24 hours a day, 7 days a week. The failure of an engineer to fulfill all emergency and regularly scheduled engine-room responsibilities could result in damage to the equipment, collision with a bridge, or the sinking of the vessel. Such failure could also result in loss of employment. The testimony at trial was that these working conditions were unsafe and unhealthy.

Testimony at trial also established that a minimum of three regular engine-room people per trip, scheduled on opposite watches, were required to properly maintain the Miss Kae D and to allow its engine crew adequate sleep. Other companies in the barge-towing industry crewed a minimum of two engineers on similar vessels, working opposite schedules, in order to allow for uninterrupted sleep.

The defendant's company policy stated that its engineers were to be assigned to work 12–hour shifts and that "the engineer has no one to relieve nor is relieved by anyone." On the Miss Kae D, however, the engineer was expected to interrupt his sleep and rest hours to work numerous additional hours during his "off watch" periods to perform unscheduled work, including responding to engine alarms, taking on fuel, and changing power packs. It was impossible for the engineer to schedule his work, so as to allow for adequate

sleep, because the alarms, emergency situations and general work demands were unpredictable and frequent and because the completion of some duties essential for continuous vessel operation required more than six hours of continuous work. Sleeping conditions for the defendant's engineers were further compromised by the constant loud noise created by the nearby engines. Mr. Duncan's sleep was also often interrupted or destroyed by the sound of loud alarms in his bedroom, signaling real and false emergencies, which required his immediate mental and physical attention. Extreme fatigue resulted from the excessive hours, inadequate assistance and sleep deprivation. Requests by Mr. Duncan and other engineers for assistance were either unanswered or refused. Instead of providing assistance to the chief engineers, the defendant occasionally would require them to train other employees to work as engineers, which actually created more work with additional stress and responsibilities for chief engineers like Mr. Duncan.

Mr. Duncan was required to work as the only scheduled engineer on the Miss Kae D for 15 consecutive days prior to his death. Mr. Duncan began his last trip on May 23, 1999. On May 31st, the day that he died, Mr. Duncan did not have a trainee engineer on board, but was assisted by second chief engineer Brad Barton, who had gotten on the vessel the previous day. During his last days, Mr. Duncan was prevented from getting enough sleep or any rest because of alarms, mechanical problems, and inadequate assistance to such an extent that he told Mr. Barton that "they're killing me." According to Mr. Barton, Mr. Duncan "looked like a zombie." Mr. Barton testified that Mr. Duncan was under significant stress when Mr. Barton got on the boat the day before Mr. Duncan died. Mr. Duncan's face was pale white and ghostly. Mr. Duncan confided to Mr. Barton that he had been having significant problems. Mr. Duncan had said he felt terrible, that he had been on the boat by himself for a period of somewhere between eleven and fifteen days, during which time there had been a considerable amount of mechanical trouble with the vessel. He had been working under trying conditions with heat and with broken fans in the emergency room. He felt the need for more help but was not able to get it. In Mr. Barton's language, Mr. Duncan was absolutely exhausted, he was sick, he had been sick to his stomach the night before, he was sick to his stomach on the day he died.

During the hours preceding his death, Mr. Duncan replaced a several-hundred-pound power pack in a 125-degree engine room that had overheated due to a defective ventilation system. He was in fear of passing out. Mr. Duncan began to feel ill and turned pale due to the work conditions, so he took a break and, about 20 minutes later, suffered a cardiac death.

Medical evidence presented at trial established that Mr. Duncan's cardiac death resulted from severe coronary artery disease and ventricular arrhythmia, and that the unsafe, unhealthy and excessive working conditions caused significant psychological stresses, such as chronic and acute anxiety, depression, sleep disturbance and inadequate sleep, excessive fatigue and emotional drain, during a period of years prior to his death, which caused him to suffer coronary artery disease and sudden cardiac death.

After hearing all of this evidence, the jury rendered a verdict in favor of the plaintiff.

### Points on Appeal

The defendant presents six points on

appeal.[1] In its first three points, the defendant contends that the trial court erred in failing to direct a verdict in the defendant's favor. The defendant claims this error because (1) Mr. Duncan suffered no physical impact nor was he in the zone of danger of a physical impact in that he died suddenly of a cardiac arrest; (2) Mr. Duncan's death was not foreseeable in that neither Mr. Duncan nor the defendant knew that Mr. Duncan suffered from coronary artery disease and its symptoms never manifested themselves before his sudden death; and (3) the plaintiff's claim is barred by the three-year statute of limitations in that the plaintiff alleged that Mr. Duncan suffered compensable pain and suffering from work-related stress during the entire seven years he worked for the defendant before his death and thus his survival cause of action for such damages accrued more than three years before this action was filed. In its fourth point on appeal, the defendant claims error due to an instruction allowing the recovery of damages for pain and suffering and for loss of society allegedly incurred before Mr. Duncan's death because the estate of a seaman who dies instantaneously can only recover pecuniary losses, and cannot recover for pain and suffering under the circumstances in this case. In its fifth point, the defendant protests that his counsel was prohibited from arguing in closing argument that Mr. Duncan experienced no pain and suffering immediately before his death and thus, under Instruction No. 9, his estate was not entitled to such damages, because counsel was entitled to explain how the law as given in the instructions applies to the facts. In its last point on appeal, the defendant claims error in the denial of its motion to dismiss for lack of venue. Finding no error, we affirm.

### Directed–Verdict Issues

We shall first address the three arguments the defendant sets forth in support of the defendant's alleged entitlement to a directed verdict.

The principal question in reviewing a trial court's denial of a motion for directed verdict or judgment notwithstanding the verdict (JNOV) is whether or not the plaintiff made a submissible case. *Missouri Dept. of Transp. ex rel. PR Developers, Inc. v. Safeco Ins. Co. of America*, 97 S.W.3d 21, 31 (Mo.App. E.D.2002). In order to make a submissible case, substantial evidence is required for each and every fact essential to liability. *Id.* The issues of whether or not the evidence is substantial and whether or not the inferences drawn are reasonable present questions of law. *Id.* This court views the evidence in the light most favorable to the jury's verdict, giving the plaintiff the benefit of all reasonable inferences. *Id.*

> In determining whether the trial court should have directed a verdict [for the moving party] or granted a judgment notwithstanding the verdict, this court must view the evidence in the light most favorable to [the adverse party] giving it the benefit of all reasonable inferences, and ignoring [the moving party's] contrary evidence except to the extent it aids [the adverse party]. Withdrawing a case from the jury is a drastic measure which should not be taken unless there is no room for reasonable minds to differ on the issues, in the exercise of a fair and impartial judgment. A jury's verdict must not be set aside unless there is a complete absence of probative facts to support the jury's verdict.

*Sheehan v. Northwestern Mut. Life Ins. Co.*, 103 S.W.3d 121, 131 (Mo.App. E.D. 2002), quoting *Southwestern Bell Yellow*

---

1. We have renumbered the points for ease of consideration.

*Pages v. Robbins,* 865 S.W.2d 361, 365–66 (Mo.App. E.D.1993).

■ The Jones Act, 46 U.S.C. Section 688, affords seamen the same rights and remedies for personal injuries provided to railway workers pursuant to the Federal Employer's Liability Act (FELA), 45 U.S.C. Section 51 et seq., and incorporates by reference the FELA. *Futrell v. Luhr Bros. Inc.,* 916 S.W.2d 348, 351 (Mo.App. E.D.1996). FELA caselaw is controlling in cases brought under the Jones Act. *Id.* The FELA is a broad remedial statute that must be liberally construed to further its humanitarian goal of holding railroads and barge companies responsible for the dangers to which their employees are exposed. *Urie v. Thompson,* 337 U.S. 163, 180, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949).

■ It is well established that the quantum of evidence required to establish liability in a FELA case is much less than in an ordinary negligence action. *Harbin v. Burlington Northern R.R. Co.,* 921 F.2d 129, 131 (7th Cir.1990). A trial judge must submit a FELA case to the jury when there is even slight evidence of negligence. *Id.* The test is simply whether the evidence justifies with reason the conclusion that employer negligence played any part, even the slightest, in producing the employee's injury. *Rogers v. Missouri Pac. R. Co.,* 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957).

■ In its first point, the defendant asserts that the fundamental issue is whether the Jones Act provides a cause of action for a fatal heart attack caused by work-related stress in the absence of any evidence of physical impact or emotional injury caused by being within the "zone of danger" of a physical impact. It does. In *Bailey v. Norfolk and Western Ry. Co.,* 942 S.W.2d 404, 410 (Mo.App. E.D.1997), a railroad employee, Bailey, asserted a claim for coronary artery disease and gastritis

caused by the railroad's negligent failure to provide adequate sleeping facilities. Bailey required heart surgery and was disabled by that condition, and he also had stomach problems. *Id.* at 407. At trial, the evidence established that Bailey's physical injuries were partially caused by his hours of work and work-related sleep deprivation over a 28–year career. *Id.* at 408. The railroad appealed Bailey's verdict, claiming that the action was barred under the physical impact/zone of danger principles announced three years earlier in *Consolidated Rail Corp. v. Gottshall,* 512 U.S. 532, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994) and subsequent cases because the injury did not result from a physical impact or result from being within a zone of danger. *Bailey,* 942 S.W.2d at 408. This Court affirmed the jury's verdict for Bailey, holding that the physical impact/zone of danger test was not a prohibition because that test is only required in a claim for negligent infliction of emotional distress, which was not asserted by Bailey, nor did he merely assert a claim for negligent failure to provide a stress-free work environment. *Id.* at 411.

This Court distinguished the claim presented in *Gottshall,* which was for negligent infliction of emotional distress by an employee who had no physical injuries, from Bailey's, which sought compensation for purely physical heart disease and gastritis injuries. *Id.* We explained as follows:

> *Gottshall* [ ] does not stand for the proposition that only claims for injuries, physical or otherwise, that are caused by physical impact or the threat of imminent physical harm are cognizable under FELA. The issue in *Gottshall* [ ] was the proper standard for evaluating claims for negligent infliction of emotional distress that are brought under the [FELA]. . . . The Federal common law

'zone of danger' test adopted by the *Gottshall* [ ] Court was designed to limit the scope of recovery for claims of negligent infliction of emotional distress under FELA, and not for all FELA claims. *Id.* at 408.

The defendant argues that *Bailey* involved a plaintiff with actual symptoms, thereby putting his employer on notice of a foreseeable injury, and that absent those narrow circumstances involving knowledge of the stress-related illness by the employer and employee, proof of a physical impact remains essential, as is clear from the later decision from the U.S. Supreme Court in *Metro–North Commuter R.R. Co. v. Buckley*, 521 U.S. 424, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997).

We disagree. *Buckley* involves a claim for negligent infliction of emotional distress, as does *Gottshall. Bailey* and the instant case do not. *Buckley's* holding is not contrary to our holding in *Bailey.* The defendant's assertion that "[b]oth *Gottshall* and *Buckley* and their progeny establish that both the FELA and the Jones Act require either a physical impact or that the plaintiff (or decedent) be in the zone of danger of a physical impact" is an incorrect statement that fails to limit the holdings of *Gottshall* and *Buckley* to claims for negligent infliction of emotional distress. *Buckley* simply held that "Buckley cannot recover emotional distress damages unless, and until, he manifests symptoms of a disease." *Buckley*, 521 U.S. at 427, 117 S.Ct. 2113.

We are also guided by the Supreme Court's recent decision in *Norfolk & Western Ry. Co. v. Ayers*, 538 U.S. 135, 123 S.Ct. 1210, 155 L.Ed.2d 261 (2003). In *Ayers*, the plaintiff had been diagnosed with asbestosis caused by exposure to asbestos at the workplace. He pursued a claim for damages, including damages for mental anguish, resulting from his fear of developing cancer. The *Ayers* Court held that the "mental anguish damages resulting from the fear of developing cancer may be recovered under the FELA by a railroad worker suffering from the actionable injury asbestosis caused by work-related exposure to asbestos." *Id.* at 141, 123 S.Ct. 1210. The *Ayers* Court distinguished the plaintiff's case from those involving merely a claim for negligent infliction of emotional distress without a physical injury, as in *Buckley*, 521 U.S. at 427, 117 S.Ct. 2113, where there was no claim of physical injury. In *Ayers*, because the asbestosis constituted a physical injury, it elevated the claim above one that was for mere exposure, as in *Buckley*, thereby eliminating the need to show an impact/zone of danger. *Ayers*, 538 U.S. at 146–148, 123 S.Ct. 1210. The *Ayers* Court explained that its decision was in harmony with *Buckley*, which "sharply distinguished exposure-only plaintiffs from 'plaintiffs who suffer from a disease,' and stated unambiguously, that 'the common law permits emotional distress recovery for [the latter] category.' " *Id.* at 156, 123 S.Ct. 1210 (quoting *Buckley*, 521 U.S. at 432, 436, 117 S.Ct. 2113).

Based on the foregoing, we conclude that the Jones Act does not prohibit a cause of action for a fatal heart attack caused by work-related stress in the absence of any evidence of physical impact or emotional injury caused by being within the "zone of danger" of a physical impact. Point denied.

In its second point, the defendant claims the trial court erred in failing to direct a verdict in the defendant's favor because Mr. Duncan's death was not foreseeable in that neither Mr. Duncan nor the defendant knew that Mr. Duncan suffered from coronary artery disease and its symptoms never manifested themselves before his sudden death.

To establish a submissible case under FELA,[2] the plaintiff must show that the railroad had a duty to provide him with a reasonably safe place to work, that the railroad breached its duty of care, that this lack of due care played some part, however slight, in producing the plaintiff's injury and that the injury was reasonably foreseeable. *White v. Union Pacific Railroad Company,* 871 S.W.2d 50, 53 (Mo.App. E.D.1993); *Bailey,* 942 S.W.2d at 411.

The defendant asserts in its brief that "[h]aving never established that [the defendant] had knowledge of Mr. Duncan's latent coronary artery disease, Plaintiff did not prove the harm was foreseeable. The evidence is undisputed that Mr. Duncan himself had no idea or any reason to know that he had coronary artery disease." Mr. Duncan's lack of knowledge of his heart disease or condition is irrelevant to the issue of the defendant's negligence. *Stewart v. Alton and Southern Ry. Co.,* 849 S.W.2d 119, 125 (Mo.App. E.D.1993). The cases cited by the defendant in support of its contention that the specific injuries suffered must be foreseeable involve claims for negligent assignment. It is the employer's prior knowledge of an employee's physical condition that is central to the concept of negligent assignment. *See, e.g., White v. Union Pacific Railroad,* 871 S.W.2d 50, 53 (Mo.App. E.D.1993). Our case does not involve a claim for negligent assignment and, therefore, these cases are inapposite. Further, the issue of foreseeability is generally a jury question. *Id.,* citing *Hertzler v. Burlington Northern Railroad Co.,* 720 S.W.2d 762, 766 (Mo. App. E.D.1986). Judicial review is limited to the reasonableness of the jury finding. *Id.* It is knowledge or anticipation of the possibility of harm to the plaintiff, not of the exact nature of the injury that is determinative. *Id.*

Mr. Duncan was deprived of adequate rest as a result of substandard sleeping and lodging conditions aboard the defendant's vessel, including erratic work schedules, sleep interruption and deprivation, physical exertion, and exposure to excessive heat and humidity. The defendant denied Mr. Duncan's requests for assistance. The working conditions caused Mr. Duncan extraordinary emotional distress that was apparent to his wife and coworkers. Expert testimony established that these working conditions were hazardous to human health and were well known in the field of medicine and science to contribute to the development of coronary artery disease, psychological distress, and sudden cardiac death. Based on the foregoing, the jury could have reasonably concluded that the defendant should reasonably have foreseen that Mr. Duncan could suffer harm from these working conditions. Point denied.

In its third point, the defendant claims the trial court erred in failing to direct a verdict in the defendant's favor because the plaintiff's claim is barred by the three-year statute of limitations, as set forth in 46 U.S.C. Section 688 (Jones Act, incorporating by reference 45 U.S.C. Section 56 and 46 U.S.C. Section 763a). The defendant argues that Mr. Duncan's survival cause of action accrued more than three years before this action was filed, because the plaintiff alleged that Mr. Duncan suffered compensable pain and suffering from work-related stress during the entire seven years he worked for the defendant before his death.

*Futrell,* 916 S.W.2d at 351.

---

2. Again, we note that FELA caselaw is controlling in cases brought under the Jones Act.

We disagree. Mr. Duncan was not aware that he was suffering from coronary artery disease that would lead to his death. There was no evidence that Mr. Duncan should have been aware that he had a compensable injury claim under the Jones Act before his death. A FELA cause of action for an occupational disease accrues when the plaintiff knows or should have known, in the exercise of reasonable diligence, the critical facts of his injury and its cause. *Johnson v. Norfolk & Western Ry. Co.*, 836 S.W.2d 83, 85 (Mo.App. E.D. 1992). Accordingly, neither the plaintiff nor Mr. Duncan had a compensable Jones Act claim until Mr. Duncan died in 1999. Thus, the defendant was not entitled to a directed verdict based on the running of the three-year statute of limitations. Point denied.

### Damages Instruction

In its fourth point, the defendant asserts that the trial court erred in giving Instruction No. 9, allowing the recovery of damages for pain and suffering and for loss of society allegedly incurred before Mr. Duncan's death, because the estate of a seaman who dies instantaneously can only recover pecuniary losses, and cannot recover for pain and suffering under the circumstances here. The form of a jury instruction is a procedural matter, but whether or not a jury was properly instructed is a question of law. *Moore ex rel. Moore v. Bi–State Development Agency*, 87 S.W.3d 279, 293 (Mo.App. E.D.2002). We first note that the plaintiff made no claim for damages for loss of society or consortium, nor did the instruction seek such damages, and therefore this portion of the defendant's point is disregarded.

Here, medical evidence established that unsafe and unhealthy working conditions caused Mr. Duncan's coronary artery disease, and this injury proved fatal when it later led to his instantaneous death. The defendant complains that Instruction No. 9 allowed the jury to award to the plaintiff damages for Mr. Duncan's pre-death pain and suffering. Instruction No. 9 provides:

If you find in favor of plaintiff Mary Duncan, then you must award her such sum as you believe will fairly and justly compensate her for any damages you believe she and Gary Duncan sustained and which Mary Duncan is reasonably certain to sustain in the future as a direct result of the fatal injury to Gary Duncan. Any award of future pecuniary damages must be included at present value. Any award you make is not subject to income tax. You must not consider grief or bereavement suffered by reason of the death.

Instruction No. 9 tracks MAI 8.01 verbatim.[3] Note 1 of MAI 8.01's Notes On Use provides that where the evidence supports the submission of damages to decedent between the time of injury and the time of death, i.e., pain and suffering, his name may be included in the instruction for compensatory damages.

The defendant claims the estate of a seaman who dies instantaneously can only recover pecuniary losses. However, the defendant only supports its argument with cases involving immediate traumatic death. Those who suffer traumatic injury

3. MAI 8.01 provides:
If you find in favor of the plaintiff, then you must award plaintiff such sum as you believe will fairly and justly compensate (here identify the beneficiaries) for any damages you believe (he, she, they) [and decedent] sustained [and (here identify the beneficiaries) are rea-

sonably certain to sustain in the future] as a direct result of the fatal injury to (name of decedent). Any award of future pecuniary damages must be included at present value. [Any award you make is not subject to income tax.] ... You must not consider grief or bereavement suffered by reason of the death.

that eventually, but not immediately, causes death, are not precluded from recovering properly pleaded and proven pain-and-suffering damages. See *St. Louis, Iron Mountain & Southern Railway Company v. Craft*, 237 U.S. 648, 35 S.Ct. 704, 59 L.Ed. 1160 (1915); *Washington Railway & Electric Company v. Scala, Administratrix Of Scala*, 244 U.S. 630, 37 S.Ct. 654, 61 L.Ed. 1360 (1917); *New Orleans & Northeastern Railroad Company et al. v. Harris, Administratrix Of Harris*, 247 U.S. 367, 38 S.Ct. 535, 62 L.Ed. 1167 (1918); *Gillespie, Administratrix v. United States Steel Corp.*, 379 U.S. 148, 85 S.Ct. 308, 13 L.Ed.2d 199 (1964); *Philomena Dooley, Personal Representative Of Estate Of Cecelio Chuapoco, Et Al., Petitioners v. Korean Air Lines Co., Ltd.*, 524 U.S. 116, 124, 118 S.Ct. 1890, 141 L.Ed.2d 102 (1998). Likewise, chronic illness or injury, such as cancer or coronary artery disease, can certainly produce pain and suffering prior to death, and FELA caselaw does not prohibit recovering pain-and-suffering damages in such cases. See, e.g., *Ayers*, 538 U.S. 135, 123 S.Ct. 1210, 155 L.Ed.2d 261; *Bailey*, 942 S.W.2d 404. There was no error in instructing the jury that they could assess pain-and-suffering damages that Gary Duncan sustained as a direct result of his coronary artery disease, even though that injury later caused him to suffer an instantaneous death. Point denied.

### Closing Argument

In its fifth point, the defendant asserts that the trial court erred in prohibiting the defendant's counsel from arguing in closing argument that Mr. Duncan experienced no pain and suffering immediately before his death and thus, under Instruction No. 9, his estate was not entitled to such damages, because counsel was entitled to explain how the law as given in the instructions applies to the facts.

■ The trial court is accorded broad discretion in ruling on the propriety of closing arguments and will suffer reversal only for an abuse of discretion. *Simpson v. Johnson's Amoco Food Shop, Inc.*, 36 S.W.3d 775, 777 (Mo.App. E.D.2001).

■ The defendant argues that it was entitled to explain how the law as given in the instructions applied to the facts. The trial court allowed the defendant to do just that. The trial court specifically allowed the defendant to argue its position that it did not believe the evidence supported a finding of suffering prior to the death. The defendant then argued this position to the jury. However, the defendant's counsel was *not* entitled to argue something contrary to the law given in the instructions, i.e., that the jury could only award damages sustained as a result of Mr. Duncan's death. Such argument is a misstatement of the law, which allows damages resulting from Mr. Duncan's fatal injury, that is, the coronary artery disease that caused his death. Point denied.

### Venue

■ In its sixth point, the defendant argues that the trial court should have dismissed the plaintiff's action for lack of venue. This point is not preserved for review. In its motion to dismiss for improper venue, the defendant claimed it was a corporation and alleged venue was improper as to it under Section 508.040, the venue statute applicable to corporations. The trial court denied the motion to dismiss based on its analysis of the applicability of Section 508.040. In its point on appeal, the defendant argues that venue was improper as to it under Section 347.069, the venue statute applicable to limited liability companies. The defendant did not raise the issue of improper venue in the trial court on the basis of its alleged

status as a limited liability company. The defendant has therefore waived this argument. See *Lochhaas v. Burnett,* 77 S.W.3d 12, 15 (Mo.App. E.D.2002) (defendant did not raise the issue of improper venue in the court below on the basis of the size and location of certain property). A party is bound on appeal by the theory it pleaded at trial, *Erwin v. City of Palmyra,* 119 S.W.3d 582, 587 fn. 3 (Mo.App. E.D.2003), and will not be heard on a different theory. Review on appeal is limited to theories advanced properly before the trial court. *Heffernan v. Reinhold,* 73 S.W.3d 659, 663 (Mo.App. E.D.2002). Point denied.

The judgment of the trial court is affirmed.

CLIFFORD H. AHRENS, P.J., and WILLIAM H. CRANDALL, JR., J., concur.